No. 13826

IN THE SUPREME COURT OF THE STATE OF MONTANA

1978

---

THE STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

L. R. BRETZ,

Defendant and Appellant.

---

Appeal from: District Court of the Eighth Judicial District,
Honorable A. B. Martin, Judge presiding.

Counsel of Record:

For Appellant:

George W. Huss argued, Miles City, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Robert S. Keller argued, Assistant Attorney General,
Kalispell, Montana
Thomas Budewitz argued, Townsend, Montana

---

Submitted: December 11, 1978

Decided: JUN 13 1979

Filed: JUN 13 1979

*Thomas J. Kearney*  Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

On December 1, 1976, after a trial by jury in the District Court of the Eighth Judicial District, the Honorable A. B. Martin presiding, defendant was convicted of fourteen counts of grand larceny, two counts of obtaining money and property by false pretenses, and two counts of preparing false evidence. He was sentenced to fourteen-year prison terms on each count with the exception of two counts of preparing false evidence which offenses were found to be incident to other offenses for which defendant was sentenced. The sentences were grouped so that defendant was ultimately sentenced to 56 years in prison, the last 30 years to be suspended on the condition that defendant reimburse the victims of the offenses within one year from the time of sentencing. Defendant was unable to make restitution within the prescribed time and brings this appeal.

In view of the number and complexity of the issues presented for review, factual summaries, insofar as they are pertinent, will accompany our discussion of individual issues.

Defendant presents twenty-one issues for review by this Court:

1. Whether defendant was denied his right to a speedy trial under the Sixth and Fourteenth Amendments to the United States Constitution and Article II, Section 24 of the 1972 Montana Constitution.

2. Whether defendant was denied his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution and Article II, Sections 4 and 24 of the 1972 Montana Constitution.

3. Whether defendant was denied his right to trial by a fair and impartial jury under the Fifth and Fourteenth Amendments to the United States Constitution and Article II, Sections 4 and 24 of the 1972 Montana Constitution by virtue of extensive pretrial and trial publicity.

4. Whether the District Court erred in denying defendant's motion to quash the information due to the lack of showing of probable cause for its filing.

5. Whether prosecution of this case was barred by the double jeopardy clause of the Fifth Amendment to the United States Constitution and the accompanying doctrine of collateral estoppel and by the provisions of section 95-1711, R.C.M. 1947, now sections 46-11-501 through -505 MCA.

6. Whether the District Court erred in refusing to grant a new trial on the basis of a juror's independent knowledge of the facts of the case.

7. Whether defendant's sentence constituted cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution and Article II, Sections 22 and 28 of the Montana Constitution of 1972.

8. Whether conditioning suspension of the last 30 years of defendant's 56 year sentence on defendant's payment of restitution by December 13, 1977, was improper and constituted cruel and unusual punishment.

9. Whether defendant's sentencing hearing was properly conducted.

10. Whether the District Court erred in admitting certain evidence.

11. Whether the State proved the essential elements of the offense of preparing false evidence.

12. Whether the State proved the essential elements of larceny by bailee.

13. Whether defendant was denied his right to a fundamentally fair trial under the Sixth and Fourteenth Amendments to the United States Constitution and Article II, Section 24 of the 1972 Montana Constitution because of alleged over-zealous acts on the part of the prosecution.

14. Whether defendant was denied the opportunity to present his defense.

15. Whether the District Court erred in allowing certain testimony with respect to reasonable attorney's fees.

16. Whether the District Court erred in excluding other testimony with respect to reasonable attorney's fees.

17. Whether the District Court erred in allowing testimony concerning other crimes of the accused.

18. Whether the District Court erred in allowing the State to impeach its own witness in the absence of a showing of surprise by the State.

19. Whether the District Court erred in allowing the testimony of Larry Sanford.

20. Whether the District Court erred with respect to its jury instructions relating to the offenses of obtaining money and property by false pretenses and preparing false evidence.

21. Whether the District Court erred in refusing certain of defendant's jury instructions and in giving certain of the State's instructions.

We will address these issues in the order of their presentation.

-4-

SPEEDY TRIAL

The following is a table of dates and events relevant to our consideration of whether defendant was denied his right to a speedy trial:

| DATE | ACTION | DAYS ELAPSED |
|------|--------|--------------|
| 7/30/74 | Information filed | 0 |
| 8/5/74 | Arraignment | 6 |
| 9/16/74 | New Information filed | 48 |
| 9/26/74 | Motion for Change of Venue filed | 58 |
| 10/15/74 | Change of Venue granted | 77 |
| 10/16/74 | State appeals order | 78 |
| 4/16/75 | Supreme Court reverses order | 260 |
| 5/8/75 | Remittitur filed | 282 |
| 5/20/75 | Amended Information filed | 294 |
| 7/29/75 | Defense procedural motions filed | 364 |
| 8/27/75 | State's response to motions filed | 393 |
| 9/17/75 | Hearing of motions and arraignment of defendant | 414 |
| 11/20/75 | State moves to continue pretrial conference | 478 |
| 12/29/75 | Pretrial conference--speedy trial motions | 517 |

The right to a speedy trial is guaranteed by both the United States and Montana Constitutions. U.S. Const., Amend. VI; 1972 Mont.Const., Art. II, §24. The federal standard, as a minimum, is imposed upon the states by the due process clause of the Fourteenth Amendment. See Dickey v. Florida (1970), 398 U.S. 30, 90 S.Ct. 1564, 26 L Ed 2d 26; Smith v. Hooey (1969), 393 U.S. 374, 89 S.Ct. 575, 21 L Ed 2d 607.

Barker v. Wingo (1972), 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L Ed 2d 101, 116-17, is the touchstone in an analysis of speedy trial issues. See State v. Tiedemann (1978), ____ Mont. _____, 584 P.2d 1284, 1287, 35 St.Rep. 1705, 1707; State v. Collins (1978), ____ Mont. ____, 582 P.2d 1179, 1186, 35 St.Rep. 993, 1002; State v. Cassidy (1978), ____ Mont. _____, 578 P.2d 735, 737, 35 St.Rep. 612, 614; State ex rel. Briceno v. District Court (1977), ____ Mont. ____, 568 P.2d 162, 164, 34 St.Rep. 927, 930; State

v. Keller (1976), 170 Mont. 372, 377, 553 P.2d 1013, 1016; State ex rel. Sanford v. District Court (1976), 170 Mont. 196, 199, 551 P.2d 1005, 1007; State v. Steward (1975), 168 Mont. 385, 389, 543 P.2d 178, 181; Fitzpatrick v. Crist (1974), 165 Mont. 382, 388, 528 P.2d 1322, 1325; State v. Sanders (1973), 163 Mont. 209, 213, 516 P.2d 372, 375.

In Barker, the petitioner was not tried until more than five years had passed from the time he was arrested. The delay in that case largely resulted from the fact that Barker's accomplice was tried six times altogether before finally being convicted. In Barker , 407 U.S. at 521, 92 S.Ct. at 2187, 33 L.Ed.2d at 111, the Supreme Court noted:

> "A . . . difference between the right to speedy trial and the accused's other constitutional rights is that deprivation of the right may work to the accused's advantage. Delay is not an uncommon defense tactic. As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof. Thus, unlike the right to counsel or the right to be free from compelled self-incrimination, deprivation of the right to speedy trial does not per se prejudice the accused's ability to defend himself." (Emphasis added.)

The Court went on to reject two approaches which could have eliminated a great deal of uncertainty in protecting the right. The suggestions were that the Court (1) hold that the Constitution requires a criminal defendant to be offered a trial within a specified time period, or (2) adopt some form of the demand-waiver doctrine. "The demand-waiver doctrine provides that a defendant waives any consideration of his right to speedy trial for any period prior to which he has not demanded a trial." Barker, 407 U.S. at 525, 92 S.Ct. at 2189, 33 L Ed 2d at 114. The Court found each of these approaches too inflexible--"the fixed-time period because it goes further than the Constitution requires; the

demand-waiver rule because it is insensitive to a right which we have deemed fundamental"--and adopted instead "a balancing test, in which the conduct of both the prosecution and the defendant are weighed." Barker, 407 U.S. at 529-30, 92 S.Ct. at 2191-2192, 33 L Ed 2d at 116.

Noting that courts must approach speedy trial cases on an ad hoc basis, the Court identified four factors to be considered as part of the balancing test: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Barker, 407 U.S. at 530, 92 S.Ct. at 2192, 33 L Ed 2d 117. We will discuss each of these factors in turn as we examine defendant's claim in the instant case. State v. Sanders (1973), 163 Mont. 209, 213, 516 P.2d 372, 375.

Length of delay. The Supreme Court addressed the delay factor as follows:

> "The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case. To take but one example, the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." Barker, 407 U.S. at 530-31, 92 S.Ct. at 2192, 33 L Ed 2d at 117. (Emphasis supplied.)

There is no question that this case is a complex one. Defendant noted in his brief that the "case consists of a transcript of 4,316 pages . . . and five full volumes of court files. There were hundreds of exhibits offered and admitted at trial." In addition to that, we note that the briefs submitted to this Court on appeal addressing twenty-one issues presented for review are over 300 pages in length.

Thus, the delay here that can be tolerated is considerably more than for an ordinary street crime.

Even so, the delay in this case is extremely long. We note, in particular, that the 205 days exhausted by the State's appeal of the change of venue order must be charged against the State. Section 95-2407, R.C.M. 1947, now section 46-20-205 MCA. Therefore, we find that the 517 days between the initial filing of an Information in this case and defendant's motion to dismiss for lack of speedy trial is of sufficient length under the circumstances of this case to trigger the inquiry into the other factors enumerated in Barker and as adopted previously by this Court.

Reason for the delay. Addressing this factor, the Supreme Court stated:

> "Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighed heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighed less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay." Barker, 407 U.S. at 531, 92 S.Ct. at 2192, 33 L Ed 2d at 117.

The State, in the instant case, argues that in light of the complexity of the case, matters proceeded in an orderly fashion. It demonstrates one delay of 54 days when defendant's defense motions were overdue. Viewing the record as a whole, the most serious delay on the part of the prosecution appears to be the 205 days taken up by the State's appeal of the October 15, 1974, change of venue order. There is no showing or any attempt to show in the record that this delay was in any way a "deliberate attempt to delay the trial in order to hamper the defense." It appears

-8-

that this delay may have been the result of some negligence on the part of the State, but crowded calendars and courts were also involved and accordingly, the time should "be weighed less heavily but nevertheless considered."

Defendant relies heavily on a Federal District Court decision in a related case, In the Matter of Carden (1978), CY-77-61-H, decided May 12, 1978. Defendant asserts that the most significant element of that Court's decision to dismiss for lack of speedy trial was the reason for the delay, specifically the length of the Carden Information.

The State addresses the length of the charging document and any delay occasioned by it in the following terms:

"The dismissal of the first information and the filing of the second information constituted no delay; three individuals were dropped, which did not prejudice the defendant, and six individuals were added, but the basic motions of the defendant against either information remained the same. The six new individuals had to be added, or the defendant would be prejudiced with another suit. The counts were doubled, but that was because of the confusion under the old larceny statutes, and it was a matter of pleading the same counts in the alternative, with the same individuals involved."

Another factor considered negligent in Carden which is not present in the instant case was delay attributable to the State by its untimely disqualification of Judge Allen and the subsequent appeal. The Federal Court held that "the decision to disqualify Judge Allen was reached in order to gain a tactical advantage over the defendants." See also Fitzpatrick v. Crist (1974), 165 Mont. 382, 528 P.2d 1322, involving a four-month delay in appointment of counsel.

The wisdom of the Supreme Court's instruction that each case be considered on an "ad hoc" basis becomes apparent at this point. The Court was undoubtedly strongly influenced by the disqualification of Judge Allen after seven months

-9-

and held it was deliberate to gain advantage.  We have no such allegation here, not even willful negligence, and a clearly distinguishable factual situation.

Assertion of the right.  In discussing the third factor in the Barker balancing test, the Supreme Court stated:

> "Whether and how a defendant asserts his right is closely related to the other factors we have mentioned.  The strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences.  The more serious the deprivation, the more likely a defendant is to complain.  The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right.  We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial."  Barker, 407 U.S. at 531-32, 92 S.Ct. at 2192-2193, 33 L Ed 2d at 117-18.

In the instant case, defendant moved for dismissal for lack of speedy trial prior to the trial's commencement.  We cannot ignore the fact, however, that at the time defendant submitted his motion he had already indicated to Judge Bradford that he intended to call more than 120 witnesses and that he felt the trial would last two months.  At various times over the next several months defendant asserted time and again that because of the complexity of the case, he could not possibly be prepared to defend himself.  This factor weighs heavily against any prejudice in the time lapse between filing and trial and gives substance to the Barker comment that speedy trial denial is not per se prejudicial to defendant's ability to defend himself.

Prejudice.  The prejudice factor is analyzed as follows:

> "Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect.  This

-10-

Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown." Barker, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L Ed 2d at 118.

Defendant lists five ways in which he felt he was prejudiced by the delay: "(1) economic hardship; (2) death of witnesses; (3) pre-trial publicity of a long duration; (4) difficulty of now finding and interviewing the State's witnesses; and (5) emotional stress and strain."

The instant case was not the only case defendant was defending at this time. Aside from disbarment proceedings before the Commission on Practice and this Court, defendant was involved in three other criminal cases and one civil case. The emotional stress and strain and the economic hardship and consumption of time was to a large extent commingled with these other proceedings and it is difficult to assess fault by any precise means. Defendant contends that five defense witnesses had died, but there was no credible evidence given as to when they died, what their testimony would have been, or whether it went to one or more counts. A mere self-serving statement does not meet the test required by Barker which demands a showing of prejudice, not merely a self-serving assertion that there may have been some prejudice.

Application. Continuing from Barker:

"We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right

of speedy trial. Rather, they are related fac-
tors and must be considered together with such
other circumstances as may be relevant. In sum,
these factors have no talismanic qualities; courts
must still engage in a difficult and sensitive
balancing process." Barker, 407 U.S. at 533, 92
S.Ct. at 2193, 33 L Ed 2d at 118.

The Court, in applying the test to the five-year delay in

Barker found certain deficiencies present but went on to

say:

"Two counterbalancing factors, however, outweigh
these deficiencies. The first is that prejudice
was minimal.

"More important than the absence of serious prej-
udice, is the fact that Barker did not want a
speedy trial." Barker, 407 U.S. at 534, 92 S.Ct.
at 2194, 33 L Ed 2d at 119.

". . . barring extraordinary circumstances, we
would be reluctant indeed to rule that a defendant
was denied this constitutional right on a record
that strongly indicates, as does this one, that
the defendant did not want a speedy trial."
Barker, 407 U.S. at 536, 92 S.Ct. at 2195, 33 L
Ed 2d at 120.

In this case, as in Barker, we cannot find a showing of

sufficient actual prejudice to invoke the extremely harsh

remedy of dismissal of the cause. In addition, the record

reflects that the speedy trial objections were again com-

mingled with defendant periodically claiming he could not be

ready for trial up to the day the trial commenced, indi-

cating, of course, a need for additional time. With the

recognition that the defendant has the right to submit

numerous and complex procedural motions prior to trial, the

resulting delays cannot now be charged exclusively to the

State. Much of the complexity and delay of this case is the

result of defendant's defense and he cannot now use the

delay that resulted to his advantage with respect to the

speedy trial without an actual showing of prejudice. We

cannot find in this record a genuine desire for a speedy

trial, which makes any prejudice minimal. As a result, prejudice was asserted but never demonstrated and there are no other extraordinary circumstances to compel this Court to rule that defendant was denied his constitutional right to a speedy trial.

EFFECTIVE ASSISTANCE OF COUNSEL

In his brief to this Court, defendant states that the ". . . issue raised here is not that the trial counsel were incompetent due to their lack of skills or actions at trial, but that they were rendered impotent and ineffective by the State's denial to them of adequate funds to prepare the defense up until a point at which they had inadequate time to prepare."

Defendant's argument is divided into three parts. First, he claims there was a "chilling effect" created by the District Court's failure to provide funds in advance for appointed defense counsel. Second, he argues that by the time funds became available, any delays having been the result of the State's resistance to certain motions, there was inadequate time in which to prepare a defense. Thus the State had allegedly put the defense in the awkward position of either having to go to trial unprepared, or, having to move for a continuance, sacrificing their speedy trial claim. Third, defendant complains that the District Court failed to provide him with an investigator to meet the effect of the manpower employed by the Attorney General in the prosecution of this case. Defendant does not argue that the State must supply an investigator in all cases but that it should have in this case because of the complexity of the case and the number of witnesses listed on the State's Information.

There was never any question that defendant's appointed counsel would be compensated; the problem arose with respect to whether they were entitled to be compensated in advance. The record does not indicate that defendant ever requested a continuance because of the claimed problem of preparation and hence he is in a poor position to allege prejudice. Finally, the appointment of two counsel for defendant obviated any need for an investigator for the general preparation for trial and in addition the court did authorize the hiring of an investigator in Alaska who worked for the defense.

Defendant's retained counsel moved to withdraw from the case in November 1975. The District Court subsequently appointed counsel for defendant in January 1976. The first real problem with appointment of counsel arose on March 31, 1976, when the State moved to set aside the District Court's March 23 order for interim payment of counsel in the amount of $9,068.74. The State argued that the payment was excessive and that the county, as opposed to the State, was liable for payment of defense counsel. The matter was appealed by the State to this Court, Application of Barron (1976), 170 Mont. 218, 552 P.2d 70. This Court affirmed the District Court's ruling and remanded the case for an evidentiary hearing to determine the amount of money due appointed counsel. The decision was issued July 9, 1976. A hearing was held on August 25 which resulted in the District Court's ordered payment of $5000 and $9,760.43 to defense counsel for their fees and expenses. By September 15, defendant's counsel had still not received their money and moved the District Court on that day to permit their withdrawal as counsel and to dismiss the action on the ground of

misconduct on the part of the Attorney General. The motion
to permit their withdrawal was based on disciplinary rule
DR2-110(b)(2) addressing mandatory withdrawal when an attor-
ney cannot continue his employment without violating another
disciplinary rule, in this case DR6-101:

> "Failure to act competently:
> (A) A lawyer shall not:
> (2) Handle a legal matter without preparation
> adequate to the circumstances."

The motion was submitted 21 days prior to the day scheduled
for trial, and defense counsel received their funds the
following day.

The problem with defendant's argument concerning this
issue is that he has made no showing that the alleged lack
of preparation on the part of his appointed counsel preju-
diced him in any way. In fact, defendant asks us to presume
his counsel were ineffective because they were not compen-
sated far in advance. Defendant does not reveal what his
counsel had been able to accomplish during the time they had
been on his case. We can only speculate as to whether any
prejudice resulted due to alleged lack of preparation on the
part of defendant's counsel. Again, without a motion for
continuance on these grounds and without any showing of
actual prejudice, we cannot presume that counsel were there-
by rendered ineffective.


PUBLICITY AND FAIR TRIAL

Statewide publicity, especially concentrated in Great
Falls, accompanied the prosecution of this case at each
stage. On July 29, 1975, defendant moved the District Court
to dismiss the charges or, in the alternative, continue the
date for trial due to extensive pretrial publicity. The

-15-

court denied the motion. Defendant again moved for dismissal on December 29, 1975. The court denied this motion as well.

Defendant again raised the issue of pretrial publicity after the swearing of the jury at his trial on October 18, 1976. By that time defendant had become the object of heavy statewide publicity because of a trial in which he had been charged with and acquitted of soliciting persons to assassinate the Attorney General. Also, a statewide general election was imminent in which the Attorney General was a gubernatorial candidate.

The publicity continued during the trial of the case. It culminated in the door-to-door distribution of a political newsletter entitled the "Montana Gazette" in which defendant's name was mentioned. On October 27, 1976, defendant filed a motion for a mistrial because of the publicity.

Defendant argues that we should presume, under the facts of this case, that the mid-trial publicity reached the nonsequestered jury. He goes on to argue that the trial court should have examined the jury concerning (1) their contact with the material and (2) its prejudicial effect upon them. Throughout his argument, it is the Attorney General's participation in the publicity that defendant objects to most strongly.

Again, we have a sword that cuts both ways. The record is clear and evidence substantial regarding defendant's own attempt to use the media to his advantage as well as his failure to move for change of venue on the basis of the publicity. For example, on October 27, 1976, defendant moved to hold prosecutor Gilbert in contempt partially on the grounds that the prosecution had been seen talking to

reporters. Coincidentally, the <u>Great Falls Tribune</u> had predicted this action and stated that defendant had contacted the reporter. The theatrics reflected in the record by defendant is not indicative of conduct tending to show genuine concern over the amount of pretrial and trial publicity and when reported cannot be condemned. Additionally, the motion was not accompanied by an affidavit leaving the court, again, no facts upon which it could act. The court did state that: "The court has observed and read the publication, at least in the <u>Great Falls Tribune</u>, and they have seemed straightforward reporting, nothing else. And how that is ever going to be prejudicial is beyond me."

Beyond that, defendant's argument that the trial court should have conducted a poll of the jury to determine whether the members had seen a copy of the "Montana Gazette" is <u>not</u> properly before this Court inasmuch as defendant made no motion for the poll in the trial court and raises the issue for the first time in this Court.

Section 95-1710, R.C.M. 1947, now section 46-13-203 MCA, sets out the procedure to obtain relief in a proper case of untoward publicity:

> "(a) The defendant or the prosecution may move for a change of place of trial on the ground that there exists in the county in which the charge is pending such prejudice that a fair trial cannot be had in such county. The motion shall be made at least fifteen (15) days prior to trial, unless, for good cause shown, it may be made thereafter.
>
> "(b) The motion shall be in writing and supported by affidavit which shall state facts showing the nature of the prejudice alleged. The defendant or the state may file counteraffidavits. The court shall conduct a hearing and determine the merits of the motion.
>
> "(c) If the court determines that there exists in the county where the prosecution is pending such prejudice that a fair trial cannot be had it shall transfer the cause to any other court of competent jurisdiction in any county where a fair trial may be had."

Unlike the cases cited by defendant, this case did not spawn editorials crying for defendant's conviction. Rather, defendant has simply provided this Court with his statement of inferences and conclusions and these are not enough. See State v. Davis (1921), 60 Mont. 426, 431, 199 P. 421, 422. In State v. Lewis (1976), 169 Mont. 290, 297, 546 P.2d 518, 522, we quoted with approval the following excerpt from Irvin v. Dowd (1961), 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L Ed 2d 751, 756. It seems especially appropriate in the instant case:

> "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."

As set forth above, defendant has failed to meet his burden of showing the nature of the publicity, the effect of the publicity, and the necessity of such a drastic remedy. He has also failed to meet the procedural requirements of moving for a change of venue and submitting an affidavit containing specific allegations as to the prejudicial nature of the publicity.


PROBABLE CAUSE FOR FILING INFORMATION

On September 16, 1974, the State filed an affidavit in support of a motion for leave to file an Information against

-18-

defendant. The affidavit listed the alleged victims in alphabetical order. Defendant sets forth the charges in his summary in three basic categories. The State combines defendant's first two categories, arguing that the existence or nonexistence of an accounting in each case is of little or no relevance in discussion probable cause.

> "(1) A settlement was made by the compensation insuror, the settlement check was deposited into a bank account, some time thereafter, ranging from days to years, the alleged victim received a check for their portion of the settlement but received no accounting from Mr. Bretz as to the amount and disposition of the total settlement. (This fact situation is applicable to the following alleged victims--Aker, Baran, DuBois, Early, Hill, Springer, Stroop and Weisgerber.)

> "(2) A settlement was made by the compensation insuror, the settlement check was deposited into a bank account, some time thereafter, ranging up to a few years, the alleged victim received a check for their portion of the settlement along with an accounting from Bretz as to the amount and disposition of the total settlement. (This fact situation is applicable to the following alleged victims--Curtiss, Gaines, Gilbert, Guszregan, Hall, LaValley, McMaster, Pohjola, Swims Under and Wesland.)

> "(3) A settlement was made by the compensation insuror, the settlement check was deposited into a bank account and the alleged victim was never contacted by Mr. Bretz and, to the date of the affidavit, had not received any portion of the settlement. (This fact situation is applicable to the following alleged victims--Barry, Fischer, Gardipee, Morris and Tannehill.)"

In his pretrial motion filed July 29, 1975, defendant moved to quash the Information on the grounds that (1) there was an abuse of probable cause set forth in the affidavit to justify filing of the Information; and (2) no crime or crimes were stated in the facts alleged in the affidavit. Defendant again raised this issue on December 29, 1975, in another pretrial motion.

Defendant argues that the fact lacking in the affidavit is the showing of intent requisite to prove larceny. He

then argues that the District Court erred in allowing the State to file the Information where the supporting affidavit failed to establish probable cause.

The basic crime with which defendant was charged and upon which he was tried was larceny by bailee as set forth in section 94-2701, R.C.M. 1947:

> "Every person who, with the intent to deprive or defraud the true owner of his property, or of the use and benefit thereof, or to appropriate the same to the use of the taker, or of any other person either--
>
> ". . .
>
> "2. Having in his possession, custody or control, as a bailee, servant, attorney, agent, clerk, trustee, or officer of any person, association, or corporation, or as a public officer, or as a person authorized by agreement or by competent authority to hold, or take such possession, custody, or control, any money, property, evidence of debt, or contract, article of value of any nature, or thing in action or possession, appropriates the same to his own use, or that of any other person other than the true owner, or person entitled to the benefit thereof, steals such property and is guilty of larceny."

Section 95-1301, R.C.M. 1947, now section 46-11-201 MCA, provides in pertinent part:

> "(a) The county attorney may apply directly to the district court for permission to file an information against a named defendant. The application must be by affidavit supported by such evidence as the judge may require. If it appears that there is probable cause to believe that an offense has been committed by the defendant the judge shall grant leave to file the information, otherwise the application shall be denied."

The rationale of probable cause for filing an information is the same as probable cause for arrest. State ex rel. Pinsoneault v. District Court (1965), 145 Mont. 233, 240, 400 P.2d 269, 273.

> "Probable cause is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." Pinsoneault, 145 Mont. at 239, 400 P.2d at 272.

-20-

Any determination with respect to the existence of probable cause for the filing of an Information must be made on a case-by-case basis viewing the peculiarities of the particular case. In addition, as the term "<u>probable</u> cause" implies, it is a concept necessarily concerned with <u>proba-</u><u>bilities</u>. The facts alleged in the Information charging defendant with a number of offenses are sufficient to establish probable cause. In so finding, we emphasize the improbability that the facts alleged resulted from innocent bookkeeping errors or clerical mistakes. Viewing the Information as a whole, the District Court did not err in concluding that probable cause existed for directly filing the Information.

## <u>DOUBLE</u> <u>JEOPARDY</u> -- <u>COLLATERAL</u> <u>ESTOPPEL</u>

Defendant was also a defendant in State v. Cline (1976), 170 Mont. 520, 555 P.2d 724, referred to by the parties as the Wampole case. Defendant claims that that case could and should have been joined with the instant case as being part of the "same transaction" as defined in section 95-1711(1)(a)(ii), R.C.M. 1947, now section 46-11-501 MCA:

> "(1)(a) The term 'same transaction' includes conduct consisting of:
>
> ". . .
>
> "(ii) <u>a series of acts or omissions which are</u> <u>motivated by a common purpose or plan and which</u> <u>result in the repeated commission of the same</u> <u>offense or affect the same person or persons or</u> <u>the property thereof.</u>" (Emphasis added.)

Defendant argues that the State merely used the Wampole case as a "dry run" to test their prosecution success. Defendant then argues that the practical effect of multiple

-21-

prosecutions was to (1) contribute to his eventual indigency; (2) expand press coverage; and, (3) provide practice for the prosecution.

We note that the Information filed in Cascade County named different defendants than the Information filed in Lewis and Clark County. In addition, the Lewis and Clark County Information was filed subsequent to that filed in Cascade County.

Both parties cite Ashe v. Swenson (1970), 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L Ed 2d 469, 475, for the definition of "collateral estoppel":

> "It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future law suit." (Emphasis added.)

The instant case involves no issue of ultimate fact which was twice litigated. If any valid objection existed in this area, it would have been proper to make the objection upon the filing of the second Information in Lewis and Clark County.

JUROR'S INDEPENDENT KNOWLEDGE

Juror Thomas Clary was a Great Falls attorney who had been asked to act as a special prosecutor to bring disbarment proceedings against another man under a Workmen's Compensation indictment. In drafting the pleadings, he had used defendant's disbarment as a model. Juror Clary had stated during voir dire that he had no knowledge of the particular counts defendant faced. But defendant's disbarment dealt at length with the facts of the Gilbert, Barry, Guszregan, Hall and Morris counts of this criminal case. Defendant argues that under the circumstances of this case, Clary's knowledge requires reversal of the conviction.

At the conclusion of the trial Juror Clary met with the judge and counsel in chambers and told them what he knew. Defendant's attorney made no objection at that time even though there were three alternate jurors available. The defense failed to meet its responsibility to the court by its failure to properly object and thereby give the court an opportunity to remedy any alleged defects that may have existed by replacing Juror Clary with one of the alternate jurors. Section 95-2404(b), R.C.M. 1947, now section 46-20-104 MCA, provides:

> "(b) Upon appeal from a judgment, the court may review the verdict or decision, and any order or decision objected to which involves the merits, or necessarily affects the judgment." (Emphasis added.)

CRUEL AND UNUSUAL PUNISHMENT

Defendant was convicted of eighteen counts in this case and sentenced on sixteen. The court imposed the maximum term of fourteen years for each of the sixteen convictions and divided the convictions into four groups of four convictions each. The sentences within each group were to be served concurrently, but the four groups of convictions were ordered to run consecutively resulting in a 56 year prison term.

> In imposing sentence, the District Court stated:

> "Now, the length of the sentence that this Court imposes cannot be understood by someone who has not heard the evidence that has been presented in this case. Now, it is true the defendant has not committed a violent crime, but his method of operation is deceit, his playing and praying upon the weak and the poor, knowing their condition, is more reprehensible, in the view of this Court, than many crimes of violence. I could review some of the cases. The Hardy case stands out, and a number of others, which are unbelievable. It is unbelievable that an attorney, admitted to the

practice of law, would engage in the type of activities that Mr. Bretz engaged in. I don't want to dramatize it, because the cases speak for themselves, and I refer the Sentence Review Board to the facts of those cases. Now, in the eyes of many, or at least some, the legal profession has been branded and stigmatized by Bretz. He, of course, has been disbarred, no longer can practice, but I'm taking this into account also in the imposition of sentence. Now, during the trial Mr. Bretz, through the news media, made certain public statements that demonstrate an unbelievable arrogance and lack of conscience on his part. Now one thing he referred to is a reversal of the Wampole case by the Federal Appeals Court. That reversal apparently clears his conscience. He also, in that same news item, critized [sic] the State for wasting money in the prosecution of these Workmen's Compensation cases, saying that only one man has spent sixty eight days in prison for all that has been done. I take this into note, and perhaps I will correct that imbalance. He also states that he has many grounds for appeal, and that ultimately there will be a reversal, as there was in the Wampole case. This may be so. His conscience may be clear, if that so happens. But the harsh reality of his greed to the people who have been victimized will never be erased by any reversal."

Defendant was sentenced to one-fourth of the maximum sentence allowed by law for the offenses of which he was convicted. The general rule is that "a sentence within the maximum authorized by statute is not cruel and unusual . . ." State v. Karanthos (1972), 158 Mont. 461, 468, 493 P.2d 326, 330. Considering the number of counts of which defendant was convicted, the unbelievable arrogance and the lack of any showing of remorse by defendant and the sentence being 25 percent only of that allowed by law and considering all the circumstances of the case, the discretion of the trial judge cannot be called into question.


CONDITIONING SUSPENSION ON RESTITUTION

The District Court included the following conditions in the judgment and order of commitment:

"It is Further Ordered, Adjudged and Decreed that the last 30 years of the 56 year sentence herein imposed be suspended upon the following conditions.

"1. That the defendant pay into district court on or before December 13, 1977, an amount sufficient to pay all victims of the offenses for the full amount of settlement awarded by the IAB/WCD including Dennis J. Aker, Stanley C. Gaines and Eugene R. Hall.

"2. As a further penalty there shall be no deduction for attorney fees or costs claimed by the defendant.

"3. At this time the Court is advised that after allowance for payments made by the defendant, the total sum of $42,259.68 remains owing to the claimants alleged to have been defrauded.

"4. Should the defendant not make full payment within the time prescribed, the defendant will serve the sentences hereinabove imposed."

Defendant argues that these conditions are improper and amount to cruel and unusual punishment for two reasons. First, the District Court included the amount of the settlement on three counts upon which he was acquitted. Second, he argues this amounted to an excessive fine and was unconstitutionally cruel and unusual punishment considering defendant's indigent status.

Section 95-2206, R.C.M. 1947, now section 46-18-201 MCA, provides in pertinent part:

"(1) Whenever a person has been found guilty of an offense upon a verdict or a plea of guilty, the court may:

". . .

"(b) suspend execution of sentence up to the maximum sentence allowed for the particular offense. The sentencing judge may impose on the defendant any reasonable restrictions during the period of suspended sentence. Such reasonable restrictions may include:

". . .

"(iv) restitution;

". . .

-25-

"(d) commit the defendant to a correctional institution with or without a fine as provided by law for the offense;

"(e) impose any combination of subsections (1)(b), (1)(c), and (1)(d)."

When the judgment is entered on the verdict of guilty and the sentence is imposed, the criminal proceeding is at an end. Any mitigation by suspension, etc., is the beginning of the probation and rehabilitation process, and the defendant at this stage of the proceeding is not possessed of full citizenship and not entitled to all of the constitutional rights of a free man. We have met this problem in recent cases and have held as have other jursidictions and the United States Supreme Court, see State v. May (1969), 93 Idaho 343, 461 P.2d 126; Fuller v. Oregon (1974), 417 U.S. 40, 94 S.Ct. 2116, 40 L Ed 2d 642, that restitution, particularly in connection with theft-type convictions, is a proper condition for suspension or probation. A consideration of the entire record in this case demonstrates that the trial judge has been more than fair and his granting defendant an opportunity for suspension is an act of mercy he was not required to extend to this defendant.


SENTENCING HEARING

After the verdict had been returned by the jury on December 1, 1976, the court stated:

"Now, in view of the circumstances peculiar to this case, the Court deems itself well enough advised to impose penalty without calling for a pre-sentence investigation and report. I am going to set next Tuesday, December the 7th, as the time for sentencing, at the hour of 11:00 o'clock A.M.

"Now, at that time Counsel for the Defense may present any matters in mitigation of punishment if they wish it at that time."

-26-

On December 3, 1976, the prosecutors for the State sent a letter to Judge Martin setting forth their views with respect to defendant's sentencing. They attached a copy of a letter from the daughter of one of the victims in the case, which had been sent to a judge in California in another matter. Because of illness, defendant's sentencing was delayed until December 13. At that time, defense counsel stated that, in his opinion, in the absence of a presentence investigation, "the Court lack[ed] the proper necessary information to pass judgment in this matter." The State answered that, among other things, the court had had access to a copy of another presentence investigation prepared in another trial of defendant. The court said that it had looked at the report, found that it was not helpful, and then detailed for the record the reasons for the sentence it was about to impose.

Defendant objects to two parts of this procedure. First, he argues that the District Court should have ordered a presentence investigation and that the prior document was not an adequate substitute. Citing State v. Orsborn (1976), 170 Mont. 480, 555 P.2d 509, defendant argues that he should have been advised of the contents of the presentence report from the prior trial and given the opportunity to rebut any misinformation it might have contained. Next, he argues that the State should have produced for cross-examination the victim's daughter who had written the letter the prosecutors presented to the court. Failure to do this, says defendant, was a denial of due process.

Section 95-2203, R.C.M. 1947, now section 46-18-111 MCA, provides in pertinent part:

"No defendant convicted of a crime which may re-
sult in commitment for one (1) year or more in
the state prison, shall be sentenced or otherwise
disposed of before a written report of investiga-
tion by a probation officer is presented to and
considered by the court, unless the court deems
such report unnecessary." (Emphasis added.)

The obvious import of this statute is to provide a means by which a court can fashion a punishment which will fit not only the circumstances of the crime but also the individual characteristics of the person convicted. The court in the instant case, because of its familiarity with defendant and his crimes was in a position to sentence without having a presentence investigation. Defendant had seen a copy of the prior presentence investigation and had the opportunity to dispute its contents but he did not. Beyond that, the court indicated that it had not been helpful and the court's reliance on it in any way is extremely doubtful. The District Court detailed at some length its reasons for the sentence imposed on defendant and he had the opportunity to respond to those reasons at that time with any mitigating factors he could find.

The same is true of the letter sent to Judge Martin by the prosecutors with its attachment. Defendant was fur-nished with a copy of the letters and with the opportunity to mitigate any effect he felt it might have. The letter from the daughter of one of the victims was not mentioned by the judge as a contributing factor in his sentencing deci-sion and the particular count to which it related did not result in an enhanced punishment.


ADMISSION OF EXHIBITS

The State introduced the files of the Industrial Acci-dent Board Worker's Compensation Division as Exhibit No. 1

under the Business Records as Evidence Act, sections 93-801-1 through 93-801-6, R.C.M. 1947. Each file consisted primarily of the following documents:

1. Settlement draft;

2. Petition for compromise settlement;

3. Carden settlement memorandum;

4. Appointment of Attorney in Fact submitted by defendant;

5. Medical reports;

6. Affidavit in support of lump sum settlement;

7. Correspondence between the IAB and defendant;

8. Order approving settlement.

Section 93-801-2, R.C.M. 1947, provides:

"A record of an act, condition or event, shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify admission."

Defendant argues that the State was required to produce evidence of the source, mode, and time of preparation of the IAB file exhibits. In fact, the testimony of Albert G. Pillen, who was the claims manager for the State Insurance Fund at the time of most of the events in question, provided this foundation. Defendant, though, claims that Pillen could not lay the proper foundation because he had not examined the individual documents in the file. We find that Pillen was a qualified witness and that a qualified witness under circumstances like those presented in this case need not have examined every document in a file. Furthermore, again defendant has failed to demonstrate that any of the evidence presented is not trustworthy.

-29-

Defendant next addresses the admission into evidence of certain handwriting examples of defendant's three secretaries. These included abstracts of vehicle titles, driver's license applications, notary public records, and voter registration cards. Defendant objected to the introduction of these exhibits because there was no testimony that the signatures on the documents were authentic. The purpose for which the signatures were introduced was for comparison with other questioned signatures. Defendant has never alleged that the signatures are false. The signatures were properly admitted into evidence under the Public Records Exception to the Hearsay Rule, sections 93-901-1 through 93-901-5, R.C.M. 1947. Each of the records is kept by an official state or county agency for the benefit of the public. The fact that a number of signatures were introduced helped to insure their authenticity.

## PROOF OF ELEMENTS OF PREPARING FALSE EVIDENCE

Defendant argues that the State failed to prove the two counts of preparing false evidence. Count VII alleged that defendant's preparation of petitions for lump sum and compromise settlements, submitted to the IAB/WCD in the Donald Barry case after Barry had died violated section 94-1703, R.C.M. 1947. Count LI alleged similar circumstances with respect to Earl Tannehill, who was also dead. Defendant contends that the State failed to prove the following material allegations:

"A. That the documents were intended 'as evidence.'

"B. That the documents produced were of the type intended to be covered by the criminal statute.

"C. That the documents were produced in a trial, proceeding or inquiry authorized by law.

"D. That the documents were prepared in Cascade County, the venue of the trial."

Section 94-1703, R.C.M. 1947, provides as follows:

"Every person guilty of preparing any false or antedated book, paper, record, instrument in writing, or other matter or thing, with intent to produce or allow it to be produced for any fraudulent or deceitful purpose, as genuine or true, upon any trial, proceeding, or inquiry whatever, authorized by law, is guilty of a felony."

The elements of the offense of preparing false evidence which were required to be proved in the instant case are (1) preparation of a false report; (2) with intent to produce it for any fraudulent or deceitful purpose, as true; (3) upon any inquiry authorized by law. Here, the petitions presupposed live claimants since the right to compensation ceases at death. Intent is a factual question for the jury, the fraudulent purpose being to obtain money knowing he was not entitled to it. The petitions were a statutory prerequisite to the exercise of the board's discretion in awarding lump sum or compromise settlements. See section 92-715, R.C.M. 1947, now section 39-71-741 MCA.

With respect to venue, we recognize that venue must be proven in a criminal case beyond a reasonable doubt. State v. Williams (1949), 122 Mont. 279, 202 P.2d 245. In this case, sufficient evidence was presented from which the jury could determine that the State proved venue beyond a reasonable doubt. Both petitions for lump sum settlement contained defendant's signature followed by his Great Falls address. The petitions for compromise settlement resulted in checks being sent to defendant in Great Falls.

LARCENY BY BAILEE PROOF

In the amended Information, with the exception of the Barry and Tannehill counts, defendant was charged with alternative counts of Larceny by Trick and Device, section

94-2701(1), R.C.M. 1947, and Larceny by Bailee, section 94-2701(2), R.C.M. 1947. The State chose to go to trial on the Larceny by Bailee charges and dismissed the alternate counts of Larceny by Trick and Device.

Section 94-2701(2), R.C.M. 1947, provides in pertinent part:

> "Larceny defined. Every person who, with the intent to deprive or defraud the true owner of his property, or of the use and benefit thereof, or to appropriate the same to the use of the taker, or of any other person . . .
>
> ". . .
>
> "2. Having in his possession, custody, or control, as a bailee, servant, attorney, agent, clerk, trustee, or officer of any person . . . or as a person authorized by agreement or by competent authority to hold, or take such possession, custody, or control, any money, property . . . appropriates the same to his own use, or that of any other person other than the true owner, or person entitled to the benefit thereof, steals such property and is guilty of larceny."

Defendant argues that the State failed to prove three elements of the crime charged. First, he argues that the State failed to prove that defendant was an "attorney." Second, he argues that the State's proof negated the requisite element of "intent to permanently deprive" the owner of funds. Finally, he argues that the State offered proof which negated the element of authority under which defendant was holding the funds.

Initially, we note that the function of this Court in reviewing a jury verdict is to determine if the verdict is supported by substantial evidence. State v. Pepperling (1974), 166 Mont. 293, 533 P.2d 283.

> ". . . this court is not a trier of fact. . . In view of the presumption of innocence at the trial, the jury must have been instructed to that effect, but on appeal after conviction the rule changes. Then, if the record shows any substantial evidence to support the judgment, the presumption is in favor of such judgment." State v. Stoddard (1966), 147 Mont. 402, 408. 412 P.2d 827, 831.

See also State v. Cor (1964), 144 Mont, 323, 396 P.2d 86.

The record in this case amply demonstrates that defendant intended to permanently deprive his own injured clients of their money. Exhibits presented at trial showed low deposits in bank accounts maintained by defendant into which the settlement checks from the clients were deposited. In each case, it was demonstrated that there was at least one point in time when defendant could not possibly have distributed the client's share of the money to the client.

As applied to the charges in this case, section 94-2701(2) requires the State to prove that defendant took possession of the funds either as an attorney or as a person authorized by agreement or competent authority. With respect to each count, the State need prove one or the other; it need not prove both.

In each case presented here, defendant received settlement money because he had been retained as an attorney; he represented himself as an attorney; dealt with the IAB as the client's attorney; wrote letters, received correspondence, filed documents with the IAB, and received his client's money, all as an attorney. He cannot now claim that he was not an attorney, after a jury, presented with this evidence, found that he was.

The essence of defendant's next argument is that the State attempted to prove that defendant sought out his clients with the intent to ultimately steal from them. This prior intent is not consistent with the intent element present in the crime of Larceny by Bailee where, defendant argues, the intent to steal arises after the point in time when the embezzler gains control of the funds.

Here, a fiduciary relationship was created when defendant acted on behalf of his clients as their attorney. Defendant is estopped, under the facts of this case, from asserting as a defense that he harbored a felonious intent prior to the creation of the fiduciary relationship. State v. Gould (1932), 329 Mo. 828, 46 S.W.2d 886. Furthermore, the element of intent and the time of its formation is a question for the jury, a question which was resolved against defendant. Therefore, we find that there is substantial evidence in the record to support the jury's determination that defendant was guilty of the crime of Larceny by Bailee.

OVERZEALOUS PROSECUTION

Defendant argues that the cumulative effect of a series of acts by the prosecution denied him his basic constitutional right to a fair trial. He lists six specific acts:

1. Filing of multiple counts;

2. Participation in pretrial publicity;

3. Resistance of payment of appointed counsel;

4. Dismissal and refiling of charges without notice or opportunity for hearing being afforded to the defendant;

5. Demand of document from the defense in violation of defendant's Fifth Amendment right to silence; and,

6. State's withholding of names of witnesses.

We have previously addressed the underlying factual circumstances of the first three points made by defendant. Number 4 refers to the dismissal of the July 30, 1974, Information. Defendant states that if he "had been allowed to appear, this case might well have been prosecuted on a shorter, original 29-count Information with a resulting speedup in the proceedings, simplification of the issues and minimizing of publicity."

Number 5 refers to an exchange appearing on pages 2346 and 2347 of the transcript. Prosecutor Gilbert was questioning witness Earley about a visit he had received from defense counsel Connor. Gilbert asked Earley if Connor had shown him a letter at that time. Earley answered affirmatively and Gilbert then asked him if a letter he was holding was the same letter. Earley said it was not and Gilbert then asked Connor to check his files for the letter. After a brief exchange, the two attorneys approached the bench for some discussion off the record. Defense counsel then moved for a mistrial due to this request, citing it as violative of the Fifth Amendment guarantee that a defendant cannot be compelled to furnish evidence against himself.

Number 6 refers to the fact that the State was permitted to add certain witnesses to its list of witnesses following voir dire. Three of these witnesses were ultimately called to the stand in the course of the trial.

Addressing this last issue first, we note that one of the three witnesses who could have possibly prejudiced defendant's case was a witness defendant had listed as his own. Aside from this, the District Court stated at the time the witnesses were listed that he would grant a continuance on defendant's request prior to the examination of these witnesses if defense counsel needed extra time to interview the witnesses and develop their questions. This opportunity cured any prejudice which might have otherwise developed.

Concerning the alleged violation of defendant's Fifth Amendment rights, we note that no objection was made on Fifth Amendment grounds at the time of the incident. Moreover, the request was made of counsel and not of the defendant. Reviewing the transcript we cannot discern how defen-

-35-

dant could have been prejudiced by the exchange. Certainly it is not apparent from the record. In addition, the record filed with this Court does not contain an objection by defendant with respect to the dismissal of the first Information and the filing of the second.

Having previously discussed the first three matters with respect to other issues, we are left with the task of assessing the overall impact of these matters considered together. We find that the issues presented here, if they were to be considered error, are not of the quality to be in any sense prejudicial.

DENIAL OF OPPORTUNITY TO PRESENT DEFENSE

Defendant contends that certain alleged errors and erroneous ruling attendant to this case had the effect of violating his constitutional right "to have compulsory process for obtaining witnesses in his favor as guaranteed by the Sixth Amendment to the United States Constitution and Article II, Section 24 of the Montana Constitution of 1972." He breaks this assignment of error into five parts.

1. Failure to pay appointed counsel;

2. Denial and quashing of subpoenas without proper basis;

3. Refusal to allow in evidence of accountings submitted by defendant to an alleged victim;

4. The refusal to allow testimony as to work performed;

5. Having to clear out-of-state witnesses with the court and State before obtaining subpoenas.

We have previously discussed defendant's first assignment of error in this regard and found no showing of prejudice to his defense.

The denial and quashing of subpoenas mentioned refer to two incidents. The first involved defendant's failure to obtain a a subpoena duces tecum commanding Mrs. Robert Morris, the wife of an alleged victim, to bring copies of the couple's Internal Revenue returns for a number of years. Defendant himself stated the purpose for which he wished to subpoena the records:

> "Mrs. Morris will be a witness in this case for the defendant, and the purpose of this subpoena, Your Honor, it is going to become relevant in this case concerning the addresses and employers and earnings of this particular witness for the State. And the best evidence probably of the earnings, employer and addresses and so forth will by the Internal Revenue records. If Mr. and Mrs. Morris have filed a joint return of course this information is there and Mrs. Morris can provide it. And it is most relevant on this issue. This is one of the main parts of the Morris count."

The State objected to the granting of the subpoena on the grounds that it was not the best evidence and no need was shown for the records. The District Court, in denying the subpoena, stated that "[w]hen you establish a foundation and basis for it, then the court will look at it." It is not error to require a proper foundation.

A similar incident occurred concerning a subpoena by the defense of a representative of the Credit Bureau. The Credit Bureau moved to quash and the State supported the motion arguing that there was no foundation laid for the evidence to be gained. After some argument, defense counsel Barron asked that the matter be postponed until a sufficient foundation was laid. The defense apparently did not pursue this matter following that acquiescence. This specification requires no comment.

Turning to defendant's next argument regarding evidence of accountings, it appears that the testimony of Greg

Warner, an attorney who represented victim Hortick in a lawsuit against defendant, was excluded by the trial court. Defendant's offer of proof was to the effect that Mr. Warner's testimony would show that defendant was holding the money openly under a claim of right. However, this purported good faith claim to the settlement was not made until nearly a year after the settlement had been obtained and only after a demand by the victim through his attorney had been made following Hortick's being contacted by the attorney general's office thus becoming aware of the settlement. As such, this evidence was not relevant to his defense of good faith.

Next, defendant claims that he offered to prove that victim Hortick had been involved in criminal difficulties, that he had retained defendant to defend him, that defendant did some work in this matter and was entitled to a fee. This fee was then claimed as an offset against the Hortick settlement. But defendant attempted to introduce this testimony through a former deputy county attorney. Only Hortick's or defendant's testimony could have established that defendant had been hired by Hortick, that a fee agreement had been reached, that he performed a certain amount of work, that he was therefore entitled to a fee and that, in fact, he retained a portion of Hortick's Workers' Compensation settlement for that purpose. Hortick did not testify that he had retained defendant in the matter and the defense did not examine him on that point. Defendant chose not to testify, and we are precluded from drawing any conclusions from that fact. However, in the absence of the proper foundational testimony, the evidence was properly excluded.

Finally, before obtaining subpoenas for out-of-state witnesses, the defense was required to demonstrate the materiality of the witness' testimony. The State was allowed to be present during such demonstrations. Defendant argues that his defense was thereby revealed and prejudiced. This issue arises out of a list of out-of-state witnesses containing approximately 40 names submitted just two weeks before trial. The list included persons from Alaska, Nevada, Illinois, and West Germany. The purpose of the inquiry was to determine whether these were legitimate witnesses. Again, defendant has made no showing of prejudice with respect to his inability to obtain any of these witnesses. Without such a showing, there is no error.

## TESTIMONY REGARDING ATTORNEY'S FEES

These issues relate to testimony regarding reasonable attorney's fees. The first testimony which is objected to by defendant came from Bud Pillen, Bureau Chief of the State Insurance Fund. He testified that in his observation attorneys regularly charged "twenty-five percent [of settlements] unless the case went to hearing, and then it was usually one-third." If it went to the Supreme Court, possibly forty percent. Next, Neil Keefer, a Montana attorney specializing in Workers' Compensation, testified that his normal fee to Workers' Compensation clients was 25 percent.

Defendant argues that this testimony should not have been admitted because it had nothing to do with the issue before the jury, whether defendant embezzled from the client. At the time there was no statutory limit on Workers' Compensation fees. As a result, defendant claims this testimony's only effect was to "inflame the passions of the jury and confuse the true issues."

Thereafter, defendant attempted to present the testimony of James Walsh, Deputy County Attorney for Cascade County. His testimony related to the alleged representation of Donald Hortick in the criminal matter previously discussed.

The testimony of witnesses Pillen and Keefer about the reasonableness of attorney fees was relevant to the transactions in which no fee agreement was made between the client and Bretz. Keefer's testimony was primarily limited to the Stanley Gaines file and defendant was ultimately acquitted of the count. Beyond that, the purpose of expert testimony is to assist the jury in making its determination; it does not limit the jury's capacity to decide for itself. Since the statute in effect at the time provided that an agreement as to attorney's fees could be implied, some standard by which the jury could determine what such an implied agreement might be was essential. In addition to this, even where there was an agreed fee, defendant often did not adhere to the agreement though this gave the jury an independent basis for its determination. In the Gilbert case, for example, defendant kept 80 percent for his fee.

We have already addressed the foundational deficiencies of Walsh's testimony and find no error.

TESTIMONY BY GERLACH CONCERNING OTHER CRIMES

Dr. William Gerlach was called by the State to refute certain medical reports that appeared in the IAB files. Dr. Gerlach testified that he would dictate medical reports on various patients and then would have them typed by defendant's office. They would be returned to him for his review or signature. Dr. Gerlach went on to testify that the

medical reports on Ray Pohjola and Earl Tannehill were not prepared or signed by him.

Defendant argues that this testimony was irrelevant in that it amounted to an accusation that defendant had committed the crimes of forgery and obtaining money by false pretenses, crimes which he was not charged with in the Pohjola or Tannehill counts. Furthermore, defendant was charged in the Tannehill matter with preparing a false petition for compromise settlement and the jury may have confused the issues and the proof.

In State v. Phillips (1953), 127 Mont. 381, 394, 264 P.2d 1009, 1016, we stated:

> ". . . transactions which are so related to, and connected with, the forgery charged as to be otherwise admissible are not inadmissible because they tend to prove a wholly dissimilar crime, particularly where they constitute part of a connected or continuous transaction on the part of the accused."

The evidence in this case tends to show that the Gerlach medical reports had been fraudulently submitted to the IAB and constitute part of a connected or continuous transaction on the part of defendant. The testimony goes to demonstrate the manner in which defendant set up the system by which he could commit the crimes with which he was eventually charged.

IMPEACHMENT OF WITNESS McMASTER BY STATE

George McMaster was the State's second witness and once he was on the stand the court allowed the State to impeach him.

Section 93-1901-8, R.C.M. 1947, provides:

> "The party producing a witness is not allowed to impeach his credit by evidence of bad character but he may contradict him by other evidence, and may also show that he has made at other times statements inconsistent with his present testimony, as provided in section 93-1901-12."

-41-

Because the State made no showing of surprise and because it was long aware that McMaster's position was that he had not been a victim, defendant argues that the court erred in permitting his testimony.

Witness McMaster testified that when he first visited defendant's office, the men agreed they would split the settlment 50-50. This was a surprise to the State because the State believed he would testify there had been no fee agreement. McMaster was a hostile witness as well because he was suing the State for $100,000 as a result of having been named as a victim in the Information filed against defendant. The State was only aware of the latter hostility of McMaster yet did not want to dismiss the McMaster count. In State v. Bloor (1898), 20 Mont. 574, 585, 52 P. 611, this Court stated:

> "It not infrequently happens that a witness is brought under the influence of an adverse party, and upon the trial completely deceives the party calling him. When such instances arise in criminal cases, by the great weight of authority the right to cross-examine arises as one necessary for the prosecution of the rights of the State against the perjury or evasion of an unwilling witness."

In State v. Traufer (1939), 109 Mont. 275, 285, 97 P.2d 336, we stated:

> ". . . A party is not bound to accept the testimony of his own witness as correct, particularly in cases of this nature where there is motive in changing the effect of a previously made statement. . ."

The District Court did not err in allowing the State to impeach the testimony of McMaster under the circumstances presented in this case. This seems particularly compelling in light of McMaster's testimony that it was defendant's idea that he make the claim against the State.

## LARRY SANFORD TESTIMONY

In the Swims Under Count (Count 47), an issue arose as to whether defendant had prosecuted a products liability suit for Mr. Swims Under against Heston Corporation. Larry Sanford, staff attorney for Heston, testified that corporation policy was to immediately inform its liability carrier by letter of any claims against the corporation. Then he testified no such letter appeared in their file.

Defendant objects to this testimony because Sanford was not employed by Heston when the suit was allegedly brought and had only been told that that was the policy at Heston at that time as well.

Section 93-401-2, R.C.M. 1947, provides:

"A witness can testify to those facts only which he knows of his own knowledge; that is, which are derived from his own perceptions, except in those few express cases in which his opinions or inferences, or the declarations of others, are admissible."

Any problem with Sanford's testimony is a problem of weight. Defendant had the opportunity to cross-examine with respect to the completeness of Heston Corporation records of the date in question. He was further entitled to argue to the jury that this testimony could not be conclusive.

## JURY INSTRUCTIONS

Counts 6 and 50 of the amended Information alleged that defendant obtained money from the IAB by false pretenses in the Barry and Tannehill cases. Counts 7 and 51 of the amended Information alleged that defendant prepared false evidence in those cases. In all four counts the items alleged to be false were Petitions for Compromise Settlement and Petitions filed by defendant. Though the jury was

adequately instructed with respect to the nature and elements of the crimes charged, defendant objects because no instruction explained to the jury that the items alleged to be false were the petitions.

First we note that during his opening statement, defense counsel requested that the court read the charging document to the jury and the court advised him that he might read those charges to the jury himself. Defense counsel Barron read the charges which are referred to in this issue at that time. In addition to this, prosecutor Gilbert, in his summation, discussed the false representations and false evidence referred to in the Information. Reviewing his statements in this regard, it appears that the jury was adequately apprised of the nature and subject of these charges.

Beyond this, the instructions which were given in this area were not erroneous; if defendant felt futher instructions, including more specific instructions were necessary, it was incumbent upon him to request more specific instructions. No such request appears in the record.

Defendant goes on to object to the giving of three particular instructions. The first instruction stated, in essence, that in the crime of larceny by bailee restitution is not a defense when the criminal intent existed at the time of the taking. In other words, the crime is complete at the point of taking with the intent to permanently deprive. Restitution is only a defense when the defendant intended to return the property at the time it was taken. This interpretation is consistent with section 94-2717, R.C.M. 1947.

Defendant next objects to the giving of the following instruction:

> "When, as in this case, it is alleged that the
> crime charged was committed on or about a cer-
> tain date, if the jury finds that the crime was
> committed, it is not necessary that the proof
> show that it was committed on that precise date;
> it is sufficient that the proof shows that the
> crime was committed prior to the filing of the
> information."

Defendant maintains that no evidence was presented to the

jury as to when the Information was filed so the instruction

was meaningless to the jury as to determining the time of

the offense. To properly utilize this instruction, a jury

should be apprised of the date of the filing of the charging

document. However, in the absence of any showing of preju-

dice, the failure of this apprisal is not reversible error.

In this case, there is no showing that any proof was pre-

sented which tended to prove that any offense had been

committed after the Information was filed.

The next instruction objected to by defendant reads as

follows:

> "If the evidence shows that defendant made simi-
> lar false representations or pretenses to persons
> other than the owner, such evidence, if believed
> by you, is sufficient corroboration."

Defendant argues that there is no evidence of false repre-

sentations to others as to the false pretense counts and the

instructions should not have been given. The State argues

that certain evidence was to be considered as such and it is

within the province of the jury to have considered it. In

either case, it would not be prejudicial error upon which to

gain a reversal.

Defendant next complains of the trial court's refusal

to instruct the jury that in order to convict defendant of

embezzlement or larceny by bailee, they must find that the

intent to steal was not present at the time he took posses-

sion of the funds. This issue has been previously discussed and we find no error. The crucial element here is that the defendant stole the money by virtue of his relationship with his client.

Defendant next objects to certain instructions being refused and others given with respect to defendant's position that he had a lien upon the settlement funds of the victims for legal services rendered. Our review of the instruction given and the instructions refused indicates no error.

Finally defendant argues that it was improper for the court to give the jury an instruction pertaining to the purposes for which the jury could consider evidence of other crimes not charged. This instruction benefits the defendant, not the State, in that it narrowly restricts the consideration which may be given such evidence.

An intense review of this complex record reveals no prejudicial error upon which a reversal of the trial court could be founded. The judgment and sentence of the District Court is affirmed.

John Conway Harrison
Justice

We concur:

_____
            Chief Justice

_____
            Justice

_____
Honorable Robert J. Boyd, District Judge, sitting in place
of Mr. Justice Daniel J. Shea.


Mr. Justice John C. Sheehy specially concurring:

I concur only in the result. The defendant is undoubtedly guilty. I am unable to condone the ignoble actions of the State that contributed to the delay in trial and the refusal to pay defendant's attorneys until forced by the court. Were defendant not an attorney, I should have dissented.

_____
            Justice